**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| KEVIN JACKSON, | : |
| | : CIVIL ACTION NO. 09-5510 (MLC) |
| Plaintiff, | : |
| | : |
| v. | : **O P I N I O N** |
| | : |
| GEORGE W. HAYMAN, et al., | : |
| | : |
| Defendants. | : |

**APPEARANCES:**

KEVIN JACKSON, Plaintiff pro se, #207013/291833B
New Jersey State Prison, P.O. Box 861, Trenton, New Jersey 08625

**COOPER, District Judge**

Plaintiff, Kevin Jackson, an inmate confined at New Jersey State Prison ("NJSP"), seeks to bring this action in forma pauperis. See 28 U.S.C. § 1915(a). Based on his affidavit of indigence and the absence of three qualifying dismissals within 28 U.S.C. § 1915(g), the Court will grant Jackson's application and file the Complaint.

The Court must review the Complaint to determine whether it should be dismissed as frivolous or malicious, for failure to state a claim upon which relief may be granted, or because it seeks monetary relief from a defendant who is immune from such relief. See 28 U.S.C. §§ 1915(e)(2), 1915A. The Court will dismiss the Complaint without prejudice.

**I.  BACKGROUND**

Jackson brings this civil action pursuant to 42 U.S.C. § 1983 against defendants, George Hayman, Commissioner of the New

Jersey Department of Corrections ("NJDOC"); Michelle Ricci, NJSP Administrator; and Mr. Muller, Chief of the Special Investigator Division.  (Complaint, Caption, ¶¶ 4b and 4c).  The following factual allegations are taken from the Complaint, and are accepted for purposes of this screening only.  The Court has made no findings as to the veracity of Jackson's allegations.

Jackson asserts that defendants are charged with the care, custody, control, discipline, and treatment of adult prisoners in New Jersey prisons.  He states that, under N.J.A.C. § 30:1B-6, et seq., these defendants have the authority to discontinue the use of the "spectrometry drug detection machines" (also called "Ion Scan machines"), which have a 1% false positive reading.  The false positive reading can be triggered from the use of over-the-counter medication, prescription drugs, contaminated money, and perfume.  Jackson states that the Federal Bureau of Prisons discontinued the use of these machines in April 2008.

Jackson appears to allege that the Ion Scan machine can be used against him and other inmates, and they may be subject to administrative segregation if there is a false positive reading.  Jackson does not actually allege that he has been placed in administrative segregation for a false positive reading.  He attaches a grievance form to his Complaint, dated October 14, 2009 (several days before he submitted his Complaint for filing), which makes a general complaint about the use of the Ion Scan machine, but does not reference an incident involving himself.

Jackson does refer to a case he brought in New Jersey state court, <u>Jackson v. Department of Corrections</u>, 335 N.J.Super. 227, 762 A.2d 255 (N.J. App. Div. 2000). There, Jackson complained about the NJDOC policy to use the Ion Scan machines for visitors. The Appellate Division held that the policy for use of the Ion Scan machines on prison visitors to detect drugs did not violate either the Fourth Amendment or the Fourteenth Amendment's due process clause. 335 N.J.Super. at 231-35.[1]

Jackson contends here that it is a violation of his right to due process and equal protection guaranteed under the Fourteenth

---

[1] In <u>Jackson</u>, the New Jersey Appellate Division found that, on April 16, 1999, the NJDOC "instituted a new policy designed to deter the introduction of controlled dangerous substances into New Jersey's correctional institutions," by requiring visitors seeking entry to a New Jersey prison facility to be searched using an Ion Scan machine and search dogs. The court stated:

> An Ion Scan machine is a small vacuum that is run over the visitor's hands and the outside of his pockets. Within five to ten seconds, it is able to determine the presence of illicit drugs. A dog trained to detect controlled dangerous substances is kept behind a chain-link fence. The dog is able to determine the presence of drugs without having physical contact with the visitor. The visitor is subject to a more intrusive search upon a positive finding by either the Ion Scan machine or the search dog. This may include the search of the visitor's vehicle. If no drugs are found despite the positive finding, the visitor is to be escorted from the prison grounds and is denied a visit on that particular day. If, despite a positive finding, the visitor refuses to be further searched, he is barred from prison visits for a longer period of time. Signs describing the new policy are to be posted at all prison facilities. Visitors may choose not to undergo an Ion Scan machine search or a passive canine search, but they will not be granted readmittance to the institution that same day.

335 N.J.Super. at 230.

Amendment. He also asserts that use of the Ion Scan machines, due to their 1% false positive readings, constitutes cruel and unusual punishment under the Eighth Amendment. (Compl., Statement of Claims ¶ 6).[2] He seeks injunctive relief, i.e., the immediate discontinuance of the Ion Scan machines. He also seeks unspecified monetary compensation. (Compl., ¶ 7).

## II.  STANDARDS FOR A SUA SPONTE DISMISSAL

In determining the sufficiency of a pro se complaint, the Court must be mindful to construe it liberally in favor of the plaintiff. See Erickson v. Pardus, 551 U.S. 89, 93-94 (2007) (following Estelle v. Gamble, 429 U.S. 97, 106 (1976) and Haines v. Kerner, 404 U.S. 519, 520-21 (1972)). The Court must "accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997). The Court need not, however, credit a pro se plaintiff's "bald assertions" or "legal conclusions." Id.

A complaint is frivolous if it "lacks an arguable basis either in law or in fact." Neitzke v. Williams, 490 U.S. 319, 325 (1989) (interpreting the predecessor of § 1915(e)(2), the former § 1915(d)). The standard for evaluating whether a

---

[2] Jackson alleges that defendants have shown deliberate indifference in the continued use of the Ion Scan machines and have failed to protect him and other prisoners from unjustified punishment resulting from their use. (Compl., ¶ 6.)

complaint is "frivolous" is an objective one.  Deutsch v. United States, 67 F.3d 1080, 1086-87 (3d Cir. 1995).

Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009), refined the standard for summary dismissal of a Complaint that fails to state a claim.  The issue there was whether Iqbal's civil rights complaint adequately alleged defendants' personal involvement in discriminatory decisions on Iqbal's treatment during detention, which, if true, violated his constitutional rights.  Id.  The Court examined Rule 8(a)(2).  Citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), for the proposition that "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,'" Iqbal, 129 S.Ct. at 1949 (quoting Twombly, 550 U.S. at 555), the Supreme Court identified two principles underlying the failure to state a claim standard:

> First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice ... .  Rule 8 ... does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.  Second, only a complaint that states a plausible claim for relief survives a motion to dismiss.  Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not "show[n]"-"that the pleader is entitled to relief."  Fed. Rule Civ. Proc. 8(a)(2).

Iqbal, 129 S.Ct. at 1949-50 (citations omitted).

The Court further explained that

> a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausible give rise to an entitlement to relief.

Id. at 1950.

Thus, to avoid summary dismissal, a civil complaint must allege "sufficient factual matter" showing that a claim is facially plausible, thereby allowing a court to draw the reasonable inference that the defendant is liable for the alleged misconduct. Id. at 1948. A plaintiff must demonstrate that the allegations of the complaint are plausible. Id. at 1949-50; see Twombly, 505 U.S. at 555, & n.3; Fowler v. UPMC Shadyside, 578 F.3d 203, 209-10 (3d Cir. 2009).

Iqbal provides the "final nail-in-the-coffin" for the "no set of facts" standard set forth in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), that applied to complaints before Twombly. Fowler, 578 F.3d at 210.[3] Now, a district court must conduct the two-part analysis set forth in Iqbal:

---

[3] In Conley, a district court was permitted to summarily dismiss a complaint for failure to state a claim only if it appeared beyond doubt that a plaintiff could prove no set of facts in support of a claim for relief. Id. at 45-46. Under this "no set of facts" standard, a complaint could effectively survive a motion to dismiss so long as it contained a bare recitation of the claim's legal elements.

> First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. [Iqbal, 129 S.Ct. at 1949-50]. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." [Id.] In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts. See Phillips, 515 F.3d at 234-35. As the Supreme Court instructed in Iqbal, "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show [n]'-'that the pleader is entitled to relief.'" Iqbal, [129 S.Ct. at 1949-50]. This "plausibility" determination will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

Fowler, 578 F.3d at 210-11.

But the sufficiency of a pro se pleading must be construed liberally in favor of the plaintiff, even after Iqbal. See Erickson v. Pardus, 551 U.S. 89 (2007).

### III.  SECTION 1983 ACTIONS

To state a claim for relief under § 1983, a plaintiff must allege, first, the violation of a right secured by the Constitution or laws of the United States and, second, that the alleged deprivation was committed or caused by a person acting under color of state law. West v. Atkins, 487 U.S. 42, 48 (1988); Piecknick v. Pennsylvania, 36 F.3d 1250, 1255-56 (3d Cir. 1994).

### IV.  ANALYSIS

The doctrine of standing, which is essential to Article III jurisdiction, consists of constitutional and prudential considerations. See Allen v. Wright, 468 U.S. 737, 751 (1984).

The prudential component embraces "judicially self-imposed limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances ..., and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked."  Allen, 468 U.S. at 751.  The Third Circuit has set forth "a three-part test for assessing whether a party satisfies prudential standing:" (1) a plaintiff must "assert his or her own legal interests rather than those of a third party;" (2) "courts [should] refrain from adjudicating abstract questions of wide public significance amounting to generalized grievances;" and (3) "a plaintiff must demonstrate that his or her interests are arguably within the 'zone of interests' that are intended to be protected by the statute, rule, or constitutional provision on which the claim is based."  Mariana v. Fisher, 338 F.3d 189, 204-05 (3d Cir. 2003).

    The constitutional component is "derived directly from the Constitution."  Allen, 468 U.S. at 751.  To meet the minimal constitutional mandate for Article III standing, plaintiffs must show (1) an "injury in fact," that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) "a causal connection between the injury and the conduct complained of," and (3) that the injury will "likely" be "redressed by a favorable decision."  Lujan v. Defenders of

Wildlife, 504 U.S. 555, 560-61 (1992); see Serv. Employees Int'l Union v. Municipality of Mt. Lebanon, 446 F.3d 419, 422 (3d Cir. 2006).

An "injury in fact" is defined as "an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560. The injury-in-fact requirement is often determinative of whether a plaintiff has standing to sue. Toll Bros. v. Twp. of Readington, 555 F.3d 131, 139 (3d Cir. 2009). Injury, in the standing context, must be sufficiently distinct and palpable to distinguish the plaintiff from the generalized and undifferentiated interest every citizen has in good government. See id. at 138. "The need to insist upon meaningful limitations on what constitutes injury for standing purposes ... flows from an appreciation of the key role that injury plays ... in a limited and separated government." Id. (quoting John G. Roberts, Jr., Article III Limits on Statutory Standing, 42 Duke L.J. 1219, 1224 (1993)).

The second element of Article III standing is one of causation. "If the injury-in-fact prong focuses on whether the plaintiff suffered harm, then the traceability prong focuses on who inflicted that harm." Toll Bros., 555 F.3d at 142. The key question is whether "the defendant's challenged actions, and not the actions of some third party, caused the plaintiff's injury."

9

Id. (citing Lujan, 504 U.S. at 560).  Moreover, "[the] causal connection need not be as close as the proximate causation needed to succeed on the merits of a tort claim."  Id. (citing Pub. Interest Research Group of N.J., Inc. v. Powell Duffryn Terminals Inc., 913 F.2d 64, 72 (3d Cir. 1990)).

   Redressability is closely related to traceability, "as two sides of a causation coin."  Toll Bros., 555 F.3d at 142 (quoting Dynalantic Corp. v. Dep't of Def., 115 F.3d 1012, 1017 (D.C.Cir. 1997)).  Whether a "favorable decision [will] alleviate the harm" is the essence of the redressability inquiry.  Id. (citing Lujan, 504 U.S. at 560-61).  As long as a plaintiff establishes a "substantial likelihood that the requested relief will remedy the alleged injury in fact," the plaintiff's claim may proceed.  Id.

   This Court is not convinced from the allegations in Jackson's Complaint that he meets the standing requirement.  Principally, Jackson has not alleged an injury-in-fact, or any harm that he himself has suffered as to the defendants' use of the Ion Scan machines.  Rather, it appears that Jackson is seeking prospective relief.  To obtain standing for prospective relief, Jackson must show a "real and immediate threat" that he would be exposed to the alleged violation of his constitutional rights.  Brown v. Fauver, 819 F.2d 395, 400 (3d Cir. 1987).  For example, in Lujan, the Court found that "'some day' intentions - without any description of concrete plans, or indeed even any speculation of when the

some day will be - do not support a finding of the 'actual or imminent' injury... ." Lujan, 504 U.S. at 564.

Jackson seems to suggest that inmates will suffer sanctions, such as administrative segregation and loss of visitation from the use of the Ion Scan machines on visitors. As to loss of visitation, it appears that Jackson may be claiming a liberty interest in unfettered visitation. Consequently, where this Court is hard-pressed to conclude that Jackson has standing to bring this action on the allegations of his Complaint, the Court will instead determine Jackson's claims on the merits.

Contact visits present security issues, as they can serve as a conduit for introducing contraband into correctional facilities. Visitors can conceal drugs or other contraband in countless ways and pass them to an inmate unnoticed by even the most vigilant observer. Recognizing these dangers, the United States Supreme Court has sustained prison regulations sharply curtailing contact visits. Ky. Dep't of Corrections v. Thompson, 490 U.S. 454, 460-65 (1989) (holding inmates have no protected liberty interest in unfettered visitation).[4]

> When ... the question involves the entry of people into the prisons for face-to-face communication with inmates, it is obvious that institutional considerations, such as security and related administrative problems, as well as the accepted and legitimate policy objectives of the corrections system

---

[4] The Court has also upheld a blanket policy barring contact visits with pretrial detainees. Block v. Rutherford, 468 U.S. 576 (1984).

> itself, require that some limitation be placed on such visitations.  So long as reasonable and effective means of communication remain open and no discrimination in terms of content is involved, we believe that, in drawing such lines, prison officials must be accorded latitude.

Pell v. Procunier, 417 U.S. 817, 826 (1974) (holding prison regulation restricting face-to-face interviews between press representatives and individual inmates did not violate First and Fourteenth Amendments); see Bell v. Wolfish, 441 U.S. 520 (1979) (government "must be able to take steps to maintain security and order at [an] institution and make certain no weapons or illicit drugs reach detainees"); Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754 (3d Cir. 1979) (jail authorities have legitimate security concern in limiting exposure of inmates to drugs); Hodges v. Klein, 412 F.Supp. 896 (D.N.J. 1976) (penal institution has interest in controlling intra-prison flow of contraband, and in protecting prison guards and other inmates).

Furthermore, the denial of contact visits does not violate an inmate's First, Eighth or Fourteenth Amendment rights.

> [T]he restriction on visitation for inmates with two substance-abuse violations ... serves the legitimate goal of deterring the use of drugs and alcohol within the prisons.  Drug smuggling and drug use in prison are intractable problems.  Withdrawing visitation privileges is a proper and even necessary management technique to induce compliance with the rules of inmate behavior, especially for high-security prisoners who have few other privileges to lose.  In this regard, we note that numerous other States have implemented similar restrictions on visitation privileges to control and deter substance-abuse violations.

Overton v. Bazzetta, 539 U.S. 126, 134 (2003) (citations omitted).

12

Given the holding in <u>Overton</u>, the restrictions on contact visits from the use of the Ion Scan machines does not violate Jackson's constitutional rights.

To the extent that Jackson is alleging that the use of the Ion Scan machines also may result in an inmate's placement in administrative segregation, the Court construes this allegation as an attempt to state a claim for deprivation of liberty without due process.  A liberty interest protected by the Due Process Clause may arise from the Due Process Clause itself or state law. <u>See</u> <u>Hewitt v. Helms</u>, 459 U.S. 460, 466 (1983); <u>Asquith v. Dep't of Corrections</u>, 186 F.3d 407, 409 (3d Cir. 1999).

As to convicted and sentenced prisoners, such as Jackson, "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight."  <u>Montanye v. Haymes</u>, 427 U.S. 236, 242 (1976), quoted in <u>Hewitt</u>, 459 U.S. at 468 and <u>Sandin v. Conner</u>, 515 U.S. 472, 480 (1995).  <u>Cf.</u> <u>Washington v. Harper</u>, 494 U.S. 210, 221-22 (1990) (prisoner has liberty interest under Due Process Clause in freedom from involuntary administration of psychotropic drugs); <u>Vitek v. Jones</u>, 445 U.S. 480, 493-94 (1980) (prisoner has liberty interest under Due Process Clause in freedom from involuntary transfer to state mental hospital coupled with mandatory treatment for mental illness, a punishment carrying

13

"stigmatizing consequences" and "qualitatively different" from punishment characteristically suffered by one convicted of crime).

"Discipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence imposed by a court of law." Sandin, 515 U.S. at 485 (upholding prisoner's sentence of 30 days' disciplinary segregation following hearing at which he was not permitted to produce witnesses); see Asquith, 186 F.3d at 410-11 (no liberty interest under Due Process Clause in remaining in halfway house).

But states may confer on prisoners liberty interests that are protected by the Due Process Clause. "But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin, 515 U.S. at 484 (finding that disciplinary segregation conditions that effectively mirrored those of administrative segregation and protective custody were not "atypical and significant hardships" in which a state conceivably might create liberty interest). In Griffin v. Vaughn, 112 F.3d 703, 708-09 (3d Cir. 1997), the court held that a 15-month confinement in administrative custody did not impose "atypical and significant hardship," even in the face of state regulations requiring release to the general population after 20 days in the absence of a

14

misconduct charge.  But the Griffin court did note that if an inmate is committed to undesirable conditions for an atypical period of time in violation of state law, that is a factor to be considered in determining whether the prisoner has been subjected to "atypical and significant hardship" triggering due process protection.  Id.

As Jackson has not alleged any facts suggesting that he has been confined in administrative segregation as a result of the Ion Scan machines, let alone that his confinement in segregation subjected him to "atypical and significant hardship," he has failed to state a claim, and accordingly, his Complaint will be dismissed without prejudice.

## V.  CONCLUSION

The Complaint will be dismissed without prejudice pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1) for failure to state a claim.  The Court will issue an appropriate order and judgment.[5]

                                            s/ Mary L. Cooper
                                            **MARY L. COOPER**
                                            United States District Judge

Dated:  May 3, 2010

---

[5] The Court notes that "'[g]enerally, an order which dismisses a complaint without prejudice is neither final nor appealable because the deficiency may be corrected by the plaintiff without affecting the cause of action.' ...  The dispositive inquiry is whether the district court's order finally resolved the case." Martin v. Brown, 63 F.3d 1252, 1257-58 (3d Cir. 1995)(quoting Borelli v. City of Reading, 532 F.2d 950, 951 (3d Cir. 1976)).  Here, the dismissal is meant to finally resolve this action.